## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SARA R., surviving wife on behalf of COREY R.,[1] | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | )   Case No. 3:23-cv-279-DWD <br> ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) <br> ) <br> ) |
| Defendant. | ) |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

Under 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision of Defendant, which denied Disability Insurance Benefits ("DIBs") to her now deceased husband, Corey R. For the reasons explained below, the Court **AFFIRMS** that decision.

### I. Procedural History

Corey protectively applied for DIBs on November 30, 2020, alleging a disability onset date of September 4, 2019. (Doc. 9-5, pgs. 5-11). The application was denied on April 20, 2021. (Doc. 9-4, pgs. 4-7). Corey sought reconsideration of that denial, but he was denied again on August 17, 2021. (Doc. 9-4, pgs. 9, 11). Corey requested a hearing, which was held on May 17, 2022. (Doc. 9-2, pgs. 46-76). An Administrative Law Judge ("ALJ") issued an Unfavorable Decision on June 13, 2022. (Doc. 9-2, pgs. 22-45). Corey's subsequent Request for Review was denied on December 14, 2022. (Doc. 9-2, pgs. 4-7).

---

[1] Plaintiff's full name will not be used due to privacy concerns.

Corey died on January 13, 2023, at the age of 39 years old. (Doc. 9-2, pgs. 2-3). Before his death, Corey exhausted his administrative remedies, so the ALJ decision is ripe for judicial review. Plaintiff argues Corey's mental residual functional capacity ("RFC") was erroneous because the ALJ "fail[ed] to account for limitations that were established by physicians whom the ALJ found persuasive[] and whose opinions were credited." (Doc. 11, pg. 1). The ALJ allegedly compounded that error by failing to account for all of Corey's mental limitations when questioning the vocational expert about suitable jobs. (Doc. 11, pg. 1). Below, the Court limits its discussion to the portions of the record and the legal authorities that are relevant to a resolution of these specific arguments.

## II. Relevant Legal Principles

To qualify for DIBs, a claimant must be disabled. To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. § 404.1520(a)(1), (2), (4). The ALJ asks whether: (1) the claimant is doing substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) in view of the claimant's RFC and past relevant work, he or she can perform past relevant work; and (5) in view of the claimant's RFC, age, education, and work experience, he or she can adjust to other work. *See* 20 C.F.R. § 404.1520(a)(4)-(g); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity at step 1, does not have an

impairment or combination of impairments at step 2, can perform past relevant work at step 4, or can adjust to other work at step 5, then the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i),(ii), (iv), (v). If the claimant has an impairment that meets the requirements at step 3 or is incapable of adjusting to other work at step 5, then he is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (v). At step 3, most mental impairment listings require two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Thompson v. Saul*, 470 F. Supp. 3d 909, 912 (E.D. Wisc. 2020). The claimant has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden of proof shifts to Defendant to show the claimant can adjust to other work existing in a significant number of jobs in the national economy. *Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

Impairments and related symptoms may cause physical and mental limitations that affect the ability to work. *See* 20 C.F.R. § 404.1545(a)(1). Steps 4 and 5 assess the most a claimant can do at work despite those limitations. *See* 20 C.F.R. § 404.1545(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). As such, an RFC, which the ALJ completes after step 3 but before steps 4 and 5, assesses the claimant's ability to perform sustained physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and for five days a week or an equivalent schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

An RFC must be based on the relevant medical and other evidence contained in the record. *See* 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ considers all impairments, including those that are nonsevere, and the claimant's ability to meet physical, mental, sensory, and other work requirements. *See* 20 C.F.R. § 404.1545(a)(2), (4); *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). A limited ability to do mental activities, such as understand, remember, carry out instructions, and respond to supervision, co-workers, and work pressures, may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. § 404.1545(c); *see also* SSR 85-15, 1985 WL 56857, *4 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.").

### III. The ALJ's Decision[2]

At step 1, the ALJ found Corey had not engaged in substantial gainful activity since the date of disability. (Doc. 9-2, pg. 25). At step 2, the ALJ found Corey had severe impairments, including congestive heart failure with cardiomyopathy, coronary artery

---

[2]The Court notes, when summarizing the ALJ's decision, it independently verified the portions of the record cited by the ALJ. To facilitate an efficient and organized review, the Court also supplemented this section with its own supporting citations to the record.

4

disease, diabetes mellitus type 2, obstructive sleep apnea, obesity, major depressive disorder, generalized anxiety disorder, and attention deficit disorder. (Doc. 9-2, pg. 25).

At step 3, the ALJ found Corey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the regulations. (Doc. 9-2, pgs. 26-27). When finding the severity of Corey's major depressive disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder (ADHD) did not, singly or in combination, meet or medically equal the criteria in the regulations, the ALJ emphasized that she considered whether the "paragraph B" criteria were satisfied. (Doc. 9-2, pg. 28). The ALJ noted, as discussed more fully in the RFC, Corey had the following degree of limitations in the areas of mental functioning: mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. (Doc. 9-2, pg. 28) (citing Function Report—Adult, Doc. 9-6, pgs. 84-92; Psychological Evaluation of Dr. Glen Wurglitz, Psy.D., Doc. 9-9, pgs. 10-14; Medical Records of Metodia J. Webster, MD, JCH Psychiatry Clinic, Doc. 9-9, pgs. 17-58, 112-133; Medical Records of Southern Illinois Associates, Doc. 9-9, pgs. 134-203; Hearing Testimony, Doc. 9-2, pgs. 53-67). Since Corey's mental impairments did not cause at least one "extreme" or two "marked" limitations, the ALJ found the "paragraph B" criteria were not satisfied in his case. (Doc. 9-2, pg. 28).

Before proceeding to step 4, the ALJ assessed Corey's RFC as follows:

[T]he claimant has the…[RFC] to perform sedentary work…except lift or carry 20 pounds maximum occasionally and 10 pounds frequently; stand and walk for 2 hours of 8 hours, sit about 6 hours of 8 hours; occasionally

> climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl; avoid more than occasional exposure to workplace hazards; *can understand[,] remember and carry out simple and detailed but not complex tasks and make simple and detailed but not complex decisions; can maintain concentration, persistence, and pace with customary breaks to complete a normal workday; with occasional interaction with coworkers in settings that require little supervision and that require no direct interaction with the general public.*

(Doc. 9-2, pg. 28) (Emphasis added.).[3]

To support the RFC assessment, the ALJ noted the following from the record. In his initial application for DIBs, Corey alleged, *inter alia*, generalized anxiety disorder and depression. (Docs. 9-2, pg. 29; 9-6, pg. 6). The ALJ further noted, in Corey's adult function report, he asserted limitations in the ability to work due to, among other things, an inability to concentrate on completing tasks without a lot of down time, stress and an increase in anxiety, and panic and anxiety attacks stemming from the time it takes to get to the restroom. (Docs. 9-2, pg. 29; 9-6, pgs. 73-74, 78-79, 84-85). Corey also indicated trouble with sleeping, anxiety when getting dressed, bathing, and urinating on himself. (Docs. 9-2, pg. 29; 9-6, pgs. 73-74, 79, 85). Corey did not prepare meals, do yard work, go out alone, or pay bills or handle a savings account, as those tasks were overwhelming and/or caused him anxiety. (Docs. 9-2, pg. 29; 9-6, pgs. 75-77, 86). Corey needed encouragement or reminders to do things, such as take his medication, because he does not know where to start or what needs to be done. (Docs. 9-2, pg. 29; 9-6, pgs. 75, 80, 86). Corey did not go places, and he socialized less, because of a fear of public spaces, large crowds, and interacting with other people. (Docs. 9-2, pg. 29; 9-6, pgs. 75-78, 90). Corey

---

[3]Plaintiff does not present any arguments pertaining to Corey's physical limitations.

was easily distracted, paid attention for only 5 minutes, could not finish what he started or follow spoken instructions, did not get along with authority figures, and could not handle stress or changes in routine. (Docs. 9-2, pg. 29; 9-6, pg. 91). Corey marked limitations on memory, completing tasks, concentrating, understanding, and following instructions. (Docs. 9-2, pg. 30; 9-6, pg. 89). Corey did not raise any new physical or mental allegations, changed conditions, or changed daily activities on reconsideration, in an updated adult function report, or on appeal. (Docs. 9-2, pg. 30; 9-6, pgs. 34-47).

Similarly, at the hearing, Corey indicated he "sleep[s] generally 12 to 14 hours a day, including naps." (Doc. 9-2, pgs. 30, 60). Also, his depression made it difficult to keep up with daily activities, including hygiene, and he had three to four panic attacks a day. (Doc. 9-2, pgs. 30, 60-61). Corey also noted a short temper. (Doc. 9-2, pgs. 30, 62).

Based on the evidence of record, the ALJ found Corey's medically determinable impairments could reasonably produce some of the above symptoms. (Doc. 9-2, pg. 30). However, the ALJ opined that the objective medical evidence and other evidence of record did not support Corey's statements concerning the intensity, persistence, and limiting effects of those symptoms or his ability to function. (Doc. 9-2, pg. 30).

From a mental standpoint, the ALJ noted that Corey did not present to any emergency room for treatment. (Doc. 9-2, pg. 32). Also, the ALJ explained that the record established Corey, when hospitalized for congestive heart failure, was started on Effexor and Buspar for depression with anxiety. (Docs. 9-2, pg. 32; 9-7, pg. 11). At a September 11, 2019, diabetic follow-up, Corey reported he was having a panic attack. (Docs. 9-2, pg.

7

32; 9-8, pgs. 131-33). Corey's mood was dysthymic and despairing, but he was alert with no memory or judgment impairment. (Docs. 9-2, pg. 32; 9-8, pg. 133).

On September 13, 2019, at a follow-up, the ALJ noted that Corey reported having panic attacks and anxiety since being released from the hospital. (Docs. 9-2, pg. 32; 9-8, pg. 125). Corey had a flat affect, but he was alert with normal grooming, a calm and euthymic mood, and no thought process or content impairment. (Docs. 9-2, pg. 32; 9-8, pg. 128). Corey was assessed as having anxiety disorder, so he was directed to continue taking psychotropic medications. (Docs. 9-2, pg. 32; 9-8, pg. 130).

In September 2020, it was noted that Corey started outpatient counselling with a social worker and a psychiatrist, Metodia Webster, M.D., for medication management of major depressive disorder, generalized anxiety disorder, and ADHD. (Docs. 9-2, pg. 32; 9-8, pg. 79; 9-9, pg. 23). A mental status examination indicated, despite some intermittent eye contact, Corey was alert and oriented to name, place, and time. (Docs. 9-2, pg. 33; 9-9, pg. 24). He was calm with no depressed mood, cooperative with good motivation and energy, and able to focus and concentrate. (Docs. 9-2, pg. 33; 9-9, pg. 24). Corey had casual grooming, stable affect, no suicidal or homicidal thoughts, coherent thought processes, good memory recall, and intact insight and judgment. (Docs. 9-2, pg. 33; 9-9, pg. 24).

The ALJ noted that Dr. Webster recorded a similarly unremarkable examination on January 28, 2021. (Docs. 9-2, pg. 33; 9-9, pgs. 41-42). The ALJ noted Corey's complaints regarding focus, concentration, motivation, and attention, were believed to be due, in part, to a lack of sleep. (Docs. 9-2, pg. 33; 9-9, pgs. 41-42). However, Corey was

8

noncompliant with CPAP, and Dr. Webster's subsequent mental status examinations were otherwise normal. (Docs. 9-2, pg. 33; 9-9, pgs. 30, 36, 48, 115, 121, 127).

On March 10, 2021, the ALJ noted that Corey underwent a psychological examination by Dr. Glen Wurglitz, Psy.D. (Docs. 9-2, pg. 32; 9-9, pg. 10). The ALJ found Dr. Wurglitz' diagnoses of bipolar disorder II, ADHD with predominantly inattentive presentation, and moderate to severe generalized anxiety disorder were inconsistent with the objective findings. (Docs. 9-2, pgs. 32-33; 9-9, pg. 14). Corey described "[s]evere anxiety and manic depression"; however, other than noting that he had just thrown up, the examination was unremarkable. (Docs. 9-2, pg. 33; 9-9, pgs. 10, 13). Specifically, Corey was neatly dressed in a black sweater and was well groomed. (Docs. 9-2, pg. 33; 9-9, pg. 10). He had a euthymic mood with an affect that was appropriate to content. (Docs. 9-2, pg. 33; 9-9, pg. 13). Corey's interaction style was open, and he had no apparent difficulty of expression. (Docs. 9-2, pg. 33; 9-9, pg. 13). Corey was also oriented to person, place, time, and purpose of visit. (Docs. 9-2, pg. 33; 9-9, pg. 13). He completed the serial 3s test without any errors. (Docs. 9-2, pg. 33; 9-9, pg. 13). Corey's short-term memory was excellent, and his immediate memory was average. (Docs. 9-2, pg. 33; 9-9, pg. 13). Further, Corey's fund of general information, judgment on a variety of comprehension probes, and awareness of current events were good. (Docs. 9-2, pg. 33; 9-9, pg. 13). Corey's discriminations between figure sizes, largest versus smallest, were not difficult, and he could correctly read and follow multi-step directions. (Docs. 9-2, pg. 33; 9-9, pg. 13). Corey was "cognitively capable of independently manning his finances." (Doc. 9-9, pg. 14). Dr. Wurglitz did not proffer an opinion as to limitations, but the ALJ noted that the

unremarkable examination was consistent with the outpatient treatment notes that failed to support a serious limitation or inability to function. (Doc. 9-2, pg. 33).

Further, the ALJ found Corey's incontinence due to anxiety and panic attacks were inconsistently reported to a social worker for a period of time, but not to Dr. Webster. (Docs. 9-2, pg. 33; 9-8, pgs. 26, 40, 45, 67, 71, 76; 9-9, pg. 98). In fact, the ALJ found Dr. Webster "repeatedly note[d]" there was no increase in urinary frequency. (Docs. 9-2, pg. 33; 9-9, pgs. 26, 33, 38, 45, 51, 57, 138-39, 172, 181, 194). Also, the ALJ noted that Corey complained of daily panic attacks to the social worker, but he was still able to spend the weekend in St. Louis with his spouse, "get out of the house" with his spouse, maintain the household, go out to eat with friends and family, work out at a friend's house, cook, and go to dinner at his father's house. (Docs. 9-2, pg. 33; 9-8, pgs. 26, 30, 40, 45; 9-9, pgs. 67, 75, 95, 419, 428, 433, 444, 502). The ALJ indicated that Corey's treatment notes also reflected that he plays video games to escape reality and is sedentary at his computer for most of the day. (Docs. 9-2, pg. 33; 9-8, pgs. 16, 75; 9-9, pgs. 32, 72, 436, 506, 541).

In November 2021, the ALJ noted Corey established care with a nurse practitioner, "looking for a new psychiatrist" and reporting generally high depression and anxiety since his hospitalization for congestive heart failure. (Docs. 9-2, pg. 34; 9-9, pgs. 138-39). The examination was unremarkable, as Corey had a sad and apathetic mood but was otherwise alert, oriented, well groomed, calm, and pleasant. (Docs. 9-2, pg. 34; 9-9, pg. 154). Corey had good eye contact, a cooperative attitude, no suicidal ideations, logical and goal directed thought processes, appropriate judgment and insight, an intact

memory, and normal attention and concentration. (Docs. 9-2, pg. 34; 9-9, pg. 154). The ALJ noted later examinations were unremarkable. (Docs. 9-2, pg. 34; 9-9, pgs. 182, 195).

In March 2022, it was noted that "Vyvanse [wa]s helping and [his] concentration and focus [was] much better." (Docs. 9-2, pg. 32; 9-9, pg. 180).  His severity of depression was "mild." (Docs. 9-2, pg. 32; 9-9, pg. 181).

Returning to the "paragraph B" criteria, the ALJ noted that, based on the subjective and objective evidence of record, Corey had mild limitations in understanding, remembering, or applying information. (Doc. 9-2, pg. 34). Greater limitations than those accounted for in the RFC were not supported. (Doc. 9-2, pg. 34). The adult function report indicated Corey did not need a reminder to perform personal care. (Docs. 9-2, pg. 34; 9-6, pgs. 84-92). Likewise, he was average in the ability to follow written instructions, such as with recipes. (Docs. 9-2, pg. 34; 9-6, pgs. 84-92). Corey could engage in multistep mental activities within his physical limits, such as by performing personal care, preparing meals, taking out the trash, purchasing items online, and taking care of pets. (Docs. 9-2, pg. 34; 9-6, pgs. 84-92; 9-9, pg. 12). The ALJ noted that, to shop online, Corey had to learn, understand, and remember basic computer and smartphone skills to access the internet, search for and find products, and take additional steps to order and pay for the products. (Doc. 9-2, pg. 34). Corey could count change and use a checkbook or money order. (Docs. 9-2, pg. 34; 9-6, pgs. 86-87). Corey drove a car, which required the use of memory and the application of information. (Docs. 9-2, pg. 34; 9-6, pgs. 76, 87).

At the administrative hearing, Corey had no difficulty responding to questions or providing information about his health and prior work history. (Doc. 9-2, pg. 34). Also,

the ALJ again noted that Dr. Wurglitz found Corey had excellent short-term memory, average immediate memory, good fund of general information, awareness of current events, and good judgment. (Docs. 9-2, pg. 34; 9-9, pg. 13). Dr. Wurglitz further noted that Corey could understand what he read and saw on television. (Docs. 9-2, pg. 34; 9-9, pg. 13). Dr. Webster's examinations, and the examinations of the nurse practitioner, noted good memory recall and intact judgment. (Docs. 9-2, pg. 34; 9-9, pgs. 23-58, 115, 121, 127).

Although Corey had moderate limitations when interacting with others, the ALJ found greater limitations in the RFC were not supported. (Doc. 9-2, pg. 34). Corey reported going out twice a week, spending time with his spouse, and getting along with family, friends, and neighbors. (Docs. 9-2, pg. 34; 9-6, pgs. 85-87) Corey did not lose a job due to his inability to get along with people, and he did not indicate limitations on the ability to get along with people in his adult function report. (Docs. 9-2, pgs. 34-35; 9-6, pgs. 84-92). Again, the ALJ noted that Corey often went out to eat with family and friends, played videos games with friends, and spent a large amount of time on the computer. (Docs. 9-2, pg. 35; 9-8, pgs. 16, 45, 75; 9-9, pgs. 67, 72, 95, 433, 436, 444, 506). Dr. Wurglitz noted open interaction and no difficulty of expression, Dr. Webster noted a cooperative attitude and calm behavior, and the nurse practitioner noted good eye contact and a cooperative attitude. (Docs. 9-2, pg. 35; 9-9, pgs. 13, 23-58, 115, 154, 173, 182, 195).

Corey had moderate limitations in concentrating, persisting, or maintaining pace, but the ALJ found greater limitations than those accounted for in the RFC were not supported. (Doc. 9-2, pg. 35). Corey cared for his pets, which the ALJ noted was an indication that he could initiate and perform tasks he understood. (Docs. 9-2, pg. 35; 9-6,

pgs. 74, 85). Corey had daily hobbies and interests, including watching television and playing computer games for 2-3 hours a day. (Docs. 9-2, pg. 35; 9-6, pgs. 74, 77, 88). The ALJ noted that computer games generally require the ability to respond to instructions, the ability to navigate levels of varying complexity to achieve specific goals, and to have situational and spatial awareness. (Doc. 9-2, pg. 35). Corey also drove a car, which required sufficient concentration, persistence, and mental skills to follow directions, read traffic signs, avoid road hazards, and evaluate and appreciate traffic. (Docs. 9-2, pg. 35; 9-6, pgs. 76, 87). The ALJ observed that, at the administrative hearing, Corey displayed adequate attention and concentration. (Doc. 9-2, pg. 35). Also, Dr. Wurglitz noted Corey was oriented and could complete the serial 3s with no errors. (Docs. 9-2, pg. 35; 9-9, pg. 13). Dr. Webster noted Corey was alert and oriented with good motivation, energy, ability to focus, and ability to concentrate. (Docs. 9-2, pg. 35; 9-9, pgs. 8-58, 114-131). Finally, the nurse practitioner noted Corey was logical, goal directed in his thought processes, and had normal attention and concentration. (Docs. 9-2, pg. 35; 9-9, pgs. 154, 173, 182, 195).

Further, Corey had mild limitations in adapting or managing himself, but greater limitations in the RFC were not supported. (Doc. 9-2, pg. 35). The ALJ found Corey was not dependent on others and did not require specific reminders for grooming and personal care, indicating he was able to maintain personal hygiene and appropriate work attire. (Doc. 9-2, pg. 35). Dr. Wurglitz and the nurse practitioner noted Corey was neatly dressed and well groomed. (Docs. 9-2, pg. 35; 9-9, pgs. 10, 154, 173, 182, 195). Dr. Webster noted casual grooming and intact insight, which supported an ability to manage psychological symptoms. (Docs. 9-2, pg. 35; 9-9, pgs. 115, 121, 127). Also, Corey's spouse

indicated he could go out alone, such that Corey could make plans independent of others. (Docs. 9-2, pg. 35; 9-6, pgs. 73-80). The ALJ found the record did not indicate problems with temper control or the ability to get along with doctors and staff. (Doc. 9-2, pg. 36).

In conclusion, even when viewing the evidence in a light most favorable to Corey, the ALJ found the evidence regarding impairments suggested that his symptoms were less limiting or persistent than alleged. (Doc. 9-2, pg. 36). The ALJ further found, while the evidence discussed above generally did not support the alleged intensity, persistence, and limiting effects of Corey's symptoms, the RFC assessed "reasonably prevent[ed] exacerbation of any symptoms arising from the…impairments." (Doc. 9-2, pg. 36).

Next, the ALJ considered the opinion evidence of record. The prior administrative findings of Dr. Donna Galassi-Hudspeth, Psy.D, on reconsideration were found to be persuasive. (Docs. 9-2, pg. 36; 9-3, pgs. 23-33). In the checklist portion of her opinion, Dr. Galassi-Hudspeth rated Corey as "Moderately Limited" in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods,  working in coordination with or in proximity to others without distraction, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number or length of breaks, interacting appropriately with the general public, and responding to changes in the work setting (Doc. 9-3, pg. 31). In the narrative summary, Dr. Galassi-Hudspeth specifically opined that Corey had the mental capacity necessary to remember work locations and general work-related procedures, perform and sustain certain three to four step tasks that

required some skills but no complex duties of a routine and repetitive type, maintain sufficient attention and concentration to persist at and complete work for the usual periods of time required by the general workforce, maintain adequate pace and perseverance for a schedule and on-time attendance, complete a normal workday and workweek on a regular basis, perform at minimally acceptable rates with rest breaks of common frequency and length, and acceptably relate to a minimally necessary degree to a supervisor and coworkers. (Docs. 9-2, pg. 36; 9-3, pg. 32). It was believed that Corey would do best in a socially undemanding and restricted setting that had reduced interpersonal contact and was nonpublic. (Docs. 9-2, pg. 36; 9-3, pg. 32).

The ALJ noted the agency consultants on reconsideration had evidence that was not available at the initial level. (Doc. 9-2, pg. 37). The findings at the initial level were inconsistent with the evidence subsequently submitted on reconsideration. (Doc. 9-2, pg. 37). For example, the ALJ found the psychological consultant's opinion was supported by the cited treatment records, particularly the consulting examination of Dr. Wurglitz, "and the subsequent generally unremarkable objective findings at the hearing level by Dr. Webster and the nurse practitioner." (Doc. 9-2, pg. 37).

The ALJ emphasized that all the evidence of record was considered in her decision, including evidence from nonmedical sources. (Doc. 9-2, pg. 38). In sum, the objective medical evidence supported the assessment of Corey's impairments and the RFC. (Doc. 9-2, pg. 38). The RFC was also consistent with his daily activities. (Doc. 9-2, pg. 38).

At step 4, the ALJ found Corey was unable to perform any past relevant work. (Doc. 9-2, pgs. 38-39). In doing so, the ALJ cited the impartial vocational expert who

testified at the administrative hearing after reviewing Corey's vocational file. (Doc. 9-2, pg. 38). The vocational expert was also present for Corey's testimony. (Doc. 9-2, pg. 38). Corey's representative did not object to (1) the vocational expert testifying as an expert in this case, (2) the vocational expert classifying his past work, or (3) a finding that those jobs constituted his past relevant work. (Doc. 9-2, pg. 38). When asked to assume a person had the same age, education, work experience, and RFC as Corey, the vocational expert opined that such a person would be unable to perform the past work. (Doc. 9-2, pg. 38).

At step 5, the ALJ found, considering Corey's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that he could perform. (Doc. 9-2, pg. 39). The ALJ noted, if Corey had the RFC to perform the full range of sedentary light work, then a finding of "not disabled" would be warranted. (Doc. 9-2, pg. 39). However, the ALJ found additional limitations impeded his ability to perform all or substantially all work at that level. (Doc. 9-2, pg. 39). Therefore, to determine the extent to which those additional limitations eroded the unskilled sedentary occupational base, the ALJ questioned the vocational expert about whether jobs existed in the national economy for an individual with Corey's age, education, work experience, and RFC. (Doc. 9-2, pg. 39). The vocational expert testified that, given those factors, the individual would be able to perform the following work at the unskilled sedentary level: (1) semi-conductor bonder (22,000 jobs nationally); (2) circuit layout taper (10,000 jobs nationally); and (3) circuit board assembly touch up screener (22,000 jobs nationally). (Doc. 9-2, pgs. 39-40). Based on an evaluation of the entire record and Corey's age, education, work experience, and RFC, the ALJ concluded he could successfully adjust to

other work existing in significant numbers in the national economy. (Doc. 9-2, pg. 40).
Therefore, the ALJ found a finding of "not disabled" was warranted. (Doc. 9-2, pg. 40).

## IV. Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about the alleged disability and the ALJ's decision is supported by substantial evidence, then the Court will affirm the ALJ. *See Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). The Court reviews the entire record, but it does not reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). That said, an ALJ must build a logical bridge between the evidence and the conclusions. *See Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

Here, the Court finds Plaintiff cannot clear the high bar for obtaining a reversal of the ALJ's decision on Corey's RFC, which was supported by substantial evidence. Indeed,

the ALJ, in her thorough and well-reasoned decision, built a logical bridge between the record evidence and her bottom-line conclusions, as required by the above authorities.

Arguing to the contrary, Plaintiff suggests, "[w]hen finding the agency physician opinions persuasive, the ALJ adopted the specific explanations contained in one [narrative explanation] section of the physicians' Mental Residual Functional Capacity..., while excluding more specific [checklist] areas of limitation." (Doc. 11, pgs. 5-6). In Plaintiff's view, the ALJ engaged in a "generalized assessment" while "flatly ignor[ing]...specific subcategories of functioning...that helped shape the generalized or summarized [narrative] assessment of mental capacities." (Doc. 11, pg. 6).

Upon considering Plaintiff's specific arguments, the Court must agree with Defendant that the ALJ's RFC assessment accounted for the necessary functional limitations and was supported by substantial evidence, as was thoroughly explained by the ALJ with citations to the record, namely, to Corey's daily activities, the medical records, and the prior administrative findings on reconsideration. Importantly, as to the prior administrative findings on reconsideration, it was the consistency between the narrative discussion of Dr. Galassi-Hudspeth and the whole evidentiary record that was found persuasive. In light of these detailed findings as to the supportability and consistency of the medical evidence and opinions of record, which achieve compliance with SSR 96-8p, the Court cannot find the ALJ committed reversable error. *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (finding, where the plaintiff argued the ALJ afforded too much weight to internally inconsistent RFC assessments of the agency consultants, the ALJ could reasonably rely on the narrative RFC because it was in fact consistent with

the 'moderate' checklist ratings…[and] [t]he ALJ must consider whether the consultants'
narrative RFC assessments 'adequately encapsulate[d] and translate[d]' the checklist."); 
*Peeters v. Saul*, 975 F.3d 639, 642 (7th Cir. 2020) (finding the ALJ properly gave "great
weight," in its RFC assessment and questioning of the vocational expert, to the state
agency opinions that the plaintiff would have moderate limitations in the work setting
but could still perform simple, routine, and repetitive work, where the opinions were
supported by substantial evidence); SSR 96-8p, 1996 WL 374184, *7 (stating "[t]he RFC
assessment must include a narrative discussion describing how the evidence supports
each conclusion, citing specific medical facts…and nonmedical evidence").

The Court notes, as suggested by Defendant, the portion of Dr. Galassi-Hudspeth's
opinion constituting the checklist is "**merely a worksheet** to aid in deciding the presence
and degree of functional limitations and the adequacy of documentation and **does not
constitute the RFC assessment**." SSA, Program Operations Manual System (POMS) DI
24510.060(B)(2)   (April   29,   2021)   (Emphasis   in   original),   *available   at*
https://secure.ssa.gov/poms.nsf/lnx/0424510060.   The   Functional   Capacity
Assessment, which may be documented in the "MRFC Additional Explanation Textbox,"
as it was here, "is for recording the mental RFC determination." *Id*. "It is in th[at] section
that the **actual mental RFC assessment is recorded**, explaining the conclusions indicated
in section I, in terms of the extent to which these mental capacities or functions could or
could not be performed in work settings." *Id*. (Emphasis in original). Here, the ALJ could
rely on Dr. Galassi-Hudspeth's narrative, and not the checklist, because it " 'adequately
encapsulate[d] and translate[d]' the checklist." *Pavlicek*, 994 F.3d at 783; (Doc. 9-3, pgs. 30-

32). A "moderate limitation" means "functioning in th[e] area is 'fair,' " which "in ordinary usage does not mean 'bad' or 'inadequate.' " *Pavlicek*, 994 F.3d at 783.

Further, Dr. Galassi-Hudspeth's RFC was consistent with the ALJ's RFC. Dr. Galassi-Hudspeth found Corey could "perform and sustain three to four step tasks that require some skills but do not require complex duties of a routine and repetitive type within any limitations of physical findings," while the ALJ found Corey could "understand[,] remember and carry out simple and detailed but not complex tasks and make simple and detailed but not complex decisions." (Docs. 9-2, pg. 28; 9-3, pg. 32). The Court will not accept Plaintiff's invitation to split hairs about the differences between completing "tasks" and "instructions." Dr. Galassi-Hudspeth found Corey "retain[ed] sufficient attention and concentration to persist at and complete work activities for the usual periods required in the general work force," while the ALJ found Corey could "maintain concentration, persistence, and pace with customary breaks to complete a normal workday." (Docs. 9-2, pg. 28; 9-3, pg. 32). Dr. Galassi-Hudspeth also found Corey was capable of "adequate pace and perseverance to maintain a schedule and on time attendance," "complet[ing] a normal workday and work week on a regular basis," and "perform[ing] at minimally acceptable rates requiring only the common frequency and lengths of rest breaks," while the ALJ found Corey could "maintain concentration, persistence, and pace with customary breaks to complete a normal workday." (Docs. 9-2, pg. 28; 9-3, pg. 32). Finally, Dr. Galassi-Hudspeth found Corey "would do best in a socially undemanding and restricted setting that requires reduced interpersonal contact, [is] away from the public…[,] [and he]…could relate acceptably with a supervisor and

coworkers to the minimally necessary degree," while the ALJ found Corey could have "occasional interaction with coworkers in settings that require little supervision and that require no direct interaction with the general public." (Docs. 9-2, pg. 28; 9-3, pg. 32). As such, the Court cannot find the differences between Dr. Galassi-Hudspeth's RFC and the ALJ's RFC are anywhere near the magnitude alleged by Plaintiff; again, the ALJ expressly found each RFC was supported by and consistent with the record. (Doc. 9-2, pgs. 36-37).

The Court reaches this conclusion despite Plaintiff's claim that the ALJ did not adequately assess Corey's ability to respond appropriately to changes in the work setting. (Doc. 11, pgs. 12-13). To be clear, as an overall conclusion, the ALJ found Corey generally had mild limitations in adapting or managing oneself. (Doc. 9-2, pg. 28). Dr. Galassi-Hudspeth found Corey's ability to respond appropriately to changes in the work setting was a moderate limitation in her checklist. (Doc. 9-3, pg. 31). Then, in her narrative RFC, Dr. Galassi-Hudspeth found Corey was capable of maintaining attention and persisting to complete work, completing a normal workday and workweek on a regular basis, and using public transportation or a vehicle to and from work. (Doc. 9-3, pg. 32). By extension, the ALJ, who relied upon Dr. Galassi-Hudspeth's RFC as persuasive, found Corey could "maintain concentration, persistence, and pace with customary breaks to complete a normal workday," and the vocational expert was asked about that capability. *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (finding, while "[i]t is well-established that 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' " the ALJ may reasonably rely on the opinion of a medical expert who translates th[ose]

findings into an RFC"); (Doc. 9-2, pgs. 28, 68, 70). While not explicitly referenced in the statement of the RFC, the ALJ's broader discussion also indicates that Corey could drive a car. (Docs. 9-2, pgs. 34-35; 9-6, pgs. 76, 87). Also, "the record discussed…d[id] not establish that the claimant ha[d] only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that [we]re not already part of the claimant's daily life." (Doc. 9-2, pg. 28). Therefore, the Court finds no error.

### V. Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: March 29, 2024.

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge